UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY VAUGHN, | ) | CASE NO. 1:21-cv-02197 |
| *Administrator of the Estate of* Mohammad J. | ) | |
| Isaifan, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND ORDER |
| | ) | |
| JAMES REA, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Kimberly Vaughn, as administrator of decedent Mohammad Isaifan's estate, brought this suit alleging that Defendants Officer James Rea and Officer Matthew Akers violated Isaifan's rights under the Fourth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, and committed certain state-law torts, namely wrongful death and assault and battery. (R. 11, PageID# 39–41). Plaintiff alleges that Defendants unreasonably seized Isaifan and, in doing so, used excessive force, causing his death. *Id.* Defendants moved for summary judgment. (R. 42). Plaintiff filed an opposition, (R. 56), and Defendants filed a reply in further support of their motion, (R. 58). For the reasons that follow, the Court will grant Defendants' motion for summary judgment.

## I. Procedural History

Plaintiff's initial complaint alleged that Defendants violated Isaifan's rights against unreasonable search and seizure and excessive force under the Fourth Amendment to the U.S. Constitution, 42 U.S.C. § 1983. (R. 1, PageID# 3–4). Plaintiff's Amended Complaint alleges that Defendants violated Isaifan's rights against unreasonable seizure and excessive force under the

Fourth Amendment, 42 U.S.C. § 1983, and committed torts in violation of state law. (R. 11, PageID# 39–41).

Following the close of discovery, Defendants moved for summary judgment. (R. 42). Defendants argue that they are entitled to qualified immunity and, therefore, summary judgment. (*Id.* at PageID# 163–79). Plaintiff filed a response opposing the motion for summary judgment on the federal claims, and she voluntarily dismissed her state-law tort claims for wrongful death and assault and battery. (R. 56). Defendants filed a reply supporting their motion, (R. 58), and later filed supporting supplemental authority, (R. 60).

## II. Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Quinn v. Eshem*, No. 16-3272, 2016 WL 9709498, at *2 (6th Cir. Dec. 20, 2016). A genuine dispute as to a material fact exists when proffered evidence that would be admissible at trial, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

"The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Cox*, 53 F.3d at 149 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989)); *see also Celotex Corp.*

2

*v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party satisfies its burden, then the burden" shifts to the nonmovant "to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox*, 53 F.3d at 150. The nonmovant may not rest upon the mere allegations in her pleadings or upon general allegations that issues of fact may exist. *See Bryant v. Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974) (per curiam). In ruling on a motion for summary judgment, a court must "construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990) (citing *Blakeman v. Mead Containers*, 779 F.2d 1146, 1150 (6th Cir. 1985), *abrogated in part by*, *Massachusetts v. Morash*, 490 U.S. 107 (1989)).

### III. Factual Background[1]

On the morning of December 15, 2019, multiple people called 911 reporting that a silver Toyota Camry had been abandoned and was partially blocking the fast lane on Interstate 76 East. (R. 42-1, PageID# 189–90). One caller reported that a man wearing purple and gray camouflage and a black vest that "looked like [a] bullet[]proof vest" got out of the car. (*Id.* at PageID# 189). After getting out of the car, the man started walking away from the car in what Defendants later determined to be the direction of Isaifan's apartment. (*Id.*, Laughlin Decl., Item 3).

Officer Brian Cresswell responded to these calls. (R. 42-2, PageID# 192). He found the silver Toyota Camry with its driver's door open parked "against the center concrete median wall with the rear driver side bumper contacting the wall." *Id.* "The vehicle was registered to" Isaifan. (*Id.* at PageID# 193). Officer Cresswell "looked into the passenger compartment" and "saw several

---

[1]     The facts set out below are undisputed unless otherwise indicated. These facts come from Plaintiff's opposition to the motion for summary judgment, (R. 56), Defendants' depositions, (R. 45; R. 46), Captain David Laughlin and Officer Brian Cresswell's affidavits attached to the motion for summary judgment, (R. 42-1; R. 42-2), surveillance footage of the incident, (R. 54), and Michael Williams's deposition, (R. 47). All evidence and reasonable inferences drawn therefrom are presented in the light most favorable to Plaintiff as the nonmovant. *Anderson*, 477 U.S. at 248; *see also Kraus*, 915 F.2d at 229.

rifle rounds in plain view in the … center console." (*Id.* at PageID# 192). He "immediately advised radio [dispatch] of the ammunition because responding officers were in the area and may have encountered the occupant." *Id.* He "was concerned for police and public safety," given what he saw and his knowledge that "the driver may have had a bullet[]proof vest." (*Id.* at PageID# 193). He "then saw an extended handgun magazine on the passenger[-]side floor" and "a black leather wallet with a chain attached." *Id.* The wallet contained Isaifan's driver's license. *Id.* He also "saw a black nylon holster in the backseat that contained an apparent 9mm handgun." *Id.* He "advised radio dispatch of this information and recovered the handgun and holster." *Id.*

Meanwhile, Defendants, two Akron police officers, were working a police job with the Akron Metropolitan Housing Authority (AMHA), providing security for an AMHA building. (R. 45, PageID# 388, 392–94; R. 46, PageID# 534–35). They heard radio transmissions reporting that a male wearing camouflage and a tactical or bulletproof vest had abandoned his vehicle on the highway with a gun and ammunition inside it. (R. 45, PageID# 393–98; *see also* R. 46, PageID# 539–43). Officer Cresswell relayed the car's license plate number, and Defendants ran the license plate number, which brought up Isaifan's information. (R. 45, PageID# 398–400; R. 46, PageID# 539–40). Officer Cresswell also relayed that Isaifan's driver's license was in the vehicle. (R. 45, PageID# 398). Defendants determined that they were near Isaifan's home address and decided to look for him by driving along the street between the location where the vehicle was abandoned and his home address. (R. 45, PageID# 406; R. 46, PageID# 542–43).

While searching that route, Defendants saw Isaifan walking down the street in the direction of his home address. (R. 45, PageID# 408–09; R. 46, PageID# 542–45, 548). Then, they saw Isaifan, wearing purple camouflage and a black vest, walk through a yard into a wooded area where he crouched down. (*See* R. 45, PageID# 409–10; R. 46, PageID# 548–49; *see* R. 54). Officer Akers

4

"pull[ed] [Defendants'] vehicle reverse of traffic angled outwards," such that the vehicle's front "bumper [wa]s directly facing" Isaifan. (R. 45, PageID# 416; *see* R. 46, PageID# 548–49; *see also* R. 54). Officer Rea "radioed it in," (R. 46, PageID# 553), and Defendants drew their firearms as they exited their vehicle, (R. 45, PageID# 420–21; R. 46, PageID# 560). They assert that they yelled several times that they were Akron police officers and ordered Isaifan to raise his hands. (R. 45, PageID# 421; R. 46, PageID# 565–66).

Surveillance footage shows and Defendants acknowledge that Isaifan initially raised his hands, but he then lowered them and began to walk towards Defendants. (R. 54; *see also* R. 45, PageID# 421, 428–30; R. 46, PageID# 566). As Isaifan approached, Officer Rea told him to get on the ground, but he did not comply. (R. 45, PageID# 429–30; R. 46, PageID# 570). Officer Rea then grabbed Isaifan with his left hand and went to holster his gun, but Isaifan resisted, "struggling with [Officer Rea], pushing [his] hand away," and pulling away. (R. 46, PageID# 570–72, 580; *see also* R. 45, PageID# 430). Officer Rea and Isaifan tripped as Isaifan resisted. (R. 45, PageID# 430, 442). During that interaction, Officer Akers saw Isaifan's vest "pull[] up" such that he could see a "gun on [Isaifan's] right hip." (*Id.* at PageID# 430). Officer Akers "start[ed] notifying Officer Rea that [Isaifan] ha[d] a gun on him" by yelling that information multiple times. (*Id.* at PageID# 430, 442). In response, Officer Rea stepped back from Isaifan, who walked between and past Defendants. (R. 54). Officer Rea "kept [his] gun out," (R. 46, PageID# 573), as did Officer Akers, (*see* R. 45, PageID# 439).

After that point, a grove of trees partially obstructs the surveillance camera's view of Isaifan and Defendants' interaction, (R. 54; *see also* R. 46, PageID# 573–74), and the parties' versions of events differ. Defendants assert that they again ordered Isaifan to get on the ground, but he was "not following any commands whatsoever." (R. 46, PageID# 580; *see also* R. 45,

PageID# 441). Instead, Isaifan took a few steps, stopped, grabbed the gun from its holster on his right side, and started turning towards Officer Akers. (R. 45, PageID# 439–40; R. 46, PageID# 580–81). After Isaifan removed the gun from its holster and simultaneously began turning, shifting his hips toward Officer Akers, Defendants started to shoot at him. (*See* R. 45, PageID# 446–49; R. 46, PageID# 582–83). Officer Rea "fired [his] first round in [Isaifan]'s back area, center mass, but he continued" turning towards Officer Akers. (R. 46, PageID# 583; *see* R. 45, PageID# 449). Officer Rea believed that Isaifan's "vest was stopping the rounds," so Officer Rea "fired below the vest to try to get [Isaifan] to stop shifting towards Officer Akers." (R. 46, PageID# 583). Nevertheless, Isaifan "continued spinning all the way around." *Id.* Thus, although Defendants' first shots hit Isaifan's back, their last shots were "towards the chest area." (*See id.* at PageID# 592). Defendants continued to shoot until Isaifan fell to the ground and no longer held a gun. (R. 45, PageID# 449, 452–53; R. 46, PageID# 592–93). Isaifan fell backward such that he was laying on his back. (R. 45, PageID# 454; R. 46, PageID# 592–93). The full encounter lasted "seconds." (R. 45, PageID# 444). Only five seconds passed from Isaifan walking past Officer Rea to Isaifan falling to the ground. (R. 54). Defendants proffer expert opinions that the physical evidence is consistent with their version of events. (*See* R. 42-6; R. 42-7).

In contrast, Plaintiff alleges that Isaifan "continue[d] to walk away from" Defendants, "never twist[ed] or lift[ed] his right arm prior to being shot by" Defendants, and had "his back facing" Defendants when they started shooting. (R. 56, PageID# 927). Plaintiff notes Michael Williams's testimony as corroborating this version of events. *See id.* Williams testifies that on the day of the shooting, he was in his living room on the love seat when he heard at least one gunshot and "[i]mmediately …. launched up to the window and [] looked through the blinds." (R. 47, PageID# 669–73, 677, 688–90). He "didn't see the first shot." (*Id.* at PageID# 700). Once he was

looking out the window, he saw Isaifan walking and "trying to get away" as Defendants continued to shoot him. (*Id.* at PageID# 689). Isaifan "had his right shoulder to [Williams,] and it never turned from that position until he fell." (*Id.* at PageID# 698–99).

The parties do not dispute that once Isaifan fell, the gun was on the ground next to him, Defendants moved his gun away from him, handcuffed him, and triaged his injuries until emergency medical services arrived. (R. 45, PageID# 455, 462; R. 46, PageID# 599, 603–07). Tragically, Isaifan died from his injuries. The medical examiner found that Defendants shot Isaifan fourteen or fifteen times total, and he had entrance wounds on the front, side, and back of his body. (R. 42-5, PageID# 292, 303).[2]

## IV. Discussion

Defendants argue that they are entitled to qualified immunity and, therefore, summary judgment on Plaintiff's remaining claims. (R. 42, PageID# 163–79). On the unreasonable seizure claim, they argue that they reasonably seized Isaifan because he abandoned his vehicle, with a gun and ammunition in it, partially blocking the fast lane of the highway. (*Id.* at PageID# 163–70). On the excessive force claim, they argue that using deadly force was reasonable because Isaifan ignored their commands, physically resisted them, grabbed his gun from its holster, and started turning towards Officer Akers with the gun in his hand. (*Id.* at PageID# 170–75, 177–79). They also argue that Williams did not see Isaifan's initial interactions with officers—only standing up and looking out his window after hearing the first gun shot—and therefore Williams's testimony does not create a genuine issue of material fact as to Isaifan's behavior before Defendants began to shoot. (*Id.* at PageID# 175–77). In fact, they argue that the Court should disregard Williams's version of events. *Id.* They assert that Williams lacked the requisite personal knowledge of the

---

[2]     Isaifan had "15 gunshot wounds," but the medical examiner notes that two of them could have been the result of the same bullet, meaning that he could have been shot fourteen times rather than fifteen. *Id.*

events leading up to Defendants' use of force because he did not begin observing the encounter until after Defendants fired their first shot. *Id.*

Plaintiff responded, opposing the motion for summary judgment. (R. 56). On the unreasonable seizure claim, she argues that Defendants did not have probable cause or reasonable suspicion to seize Isaifan, and therefore, they seized him unreasonably in violation of the Fourth Amendment. (*Id.* at PageID# 928). She asserts that Defendants lacked probable cause or reasonable suspicion because Isaifan's vehicle "was abandoned for only a half hour in total" and "abandoning a vehicle on the public way is not a crime until the vehicle remains abandoned for 48 hours." *Id.* (citing *State v. Harris*, 2009-Ohio-1948, No. 2008-CA-31, 2009 WL 1114228, at *2 (Ohio Ct. App. Apr. 17, 2009)). On the excessive force claim, Plaintiff argues that the surveillance footage, Williams's testimony, and the autopsy findings create a genuine issue of material fact as to Isaifan's behavior preceding Defendants' use of force and, thus, as to whether Defendants' use of deadly force was excessive. (*See id.* at PageID# 924, 926–27, 931). Plaintiff asserts that the surveillance footage shows that Defendants "shot and killed [Isaifan] while he was walking away from them … without holding anything in his hand" while "making no movement toward them." (*Id.* at PageID# 924, 926–27, 931). Plaintiff contends that Williams's testimony "corroborates the surveillance footage." (*Id.* at PageID# 927, 931). She asserts that the autopsy found Isaifan had entry wounds in his back and side and that the entry wounds in the front of his body were angled downward although he was taller than Defendants. (*Id.* at PageID# 927, 931 (citing R. 56-3, PageID# 1035–39)). Plaintiff argues that these pieces of evidence support the notion that Isaifan "was walking away with his back to" Defendants, "was not a threat to" Defendants, and merely possessed a firearm and, thus, that Defendants' use of deadly force was excessive. (*Id.* at PageID# 930–31).

8

Defendants replied, supporting their motion. (R. 58). They argue that they had probable cause to stop Isaifan for abandoning his vehicle partially in the fast lane on the highway because the relevant statute does not require that a vehicle be abandoned for forty-eight hours. (*Id.* at PageID# 1066–68). They also argue that their use of deadly force was reasonable because Isaifan posed "a threat of imminent harm to the officers" when he started turning towards Officer Akers "with a gun in hand" and that they did not use deadly force "against Isaifan to prevent his escape." (*Id.* at PageID# 1070–72). They further argue that the evidence Plaintiff cites does not create a genuine issue of material fact as to Isaifan's behavior before they began to shoot. (*Id.* at PageID# 1072). As to the surveillance footage, they argue that it does not create a genuine issue of material fact because it "is of poor quality" and taken at a distance with an obstructed view such that "it is not discernible from the video whether Isaifan was turning towards" Officer Akers "with a drawn firearm." *Id.* As to Williams's testimony, they argue that it does not create a genuine issue of material fact because he did not witness the events preceding Defendants firing their first shot. (*Id.* at PageID# 1073–75).[3]

## A. Qualified Immunity & Section 1983 Claims

After voluntarily dismissing her two state-law tort claims, (R. 56, PageID# 928), only Plaintiff's two Fourth Amendment claims brought under 28 U.S.C. § 1983 remain for

---

[3]    Defendants also argue that the Court should strike Plaintiff's response in opposition to the motion for summary judgment because Plaintiff's counsel failed to sign it, thereby violating Rule 11 of the Federal Rules of Civil Procedure. (*Id.* at PageID# 1063). "Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name." Fed. R. Civ. P. 11(a). A "court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention." *Id.*; *see also Moro Aircraft Leasing, Inc. v. Keith*, 789 F. Supp. 2d 841, 845 (N.D. Ohio 2011).

Here, Plaintiff's counsel did not sign the opposition to the motion for summary judgment, (*See* R. 56), as Defendants correctly note, (R. 58, PageID# 1063). Plaintiff's counsel has been on notice of this error since Defendants filed their reply. *See id.* Plaintiff's counsel has had ample time to correct this error but has not done so. Although failing to comply with Rule 11(a)'s signature requirement has serious potential consequences for litigants and it would be appropriate to strike the filing, the Court finds it more appropriate to consider the opposition as filed and issue a decision on the merits of the motion for summary judgment.

consideration. (*See* R. 11, PageID# 39–40). To prove a claim under § 1983, a plaintiff must establish "(1) that he was deprived of a right secured by the Constitution or laws of the United States[] and (2) that he was subjected to or caused to be subjected to this deprivation by a person acting under color of state law." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978)). The evidence required to prove the first element will depend upon the specific constitutional right or provision at issue. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986).

Defendants move for summary judgment on the basis that they are entitled to qualified immunity on Plaintiff's claims. (R. 42, PageID# 163–80). Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012). "Qualified immunity is a question of law resolved by courts." *Wiley v. City of Columbus*, 36 F.4th 661, 668 (6th Cir. 2022) (citing *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009)). Evaluating an assertion of qualified immunity involves analyzing whether: (1) a government official violated the plaintiff's constitutional or statutory right and (2) that right was clearly established at the time of the alleged violation. *See id.* at 668–69 (quoting *Est. of Hill ex rel. Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)). Courts may consider the two prongs of qualified immunity analysis in whatever order "will best facilitate the fair and efficient disposition of each case." *See Pearson*, 555 U.S. at 236–42. "If either inquiry is answered in the negative," then the official is entitled to qualified immunity. *Wiley*, 36 F.4th at 669 (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015)). The plaintiff bears the burden of proof on qualified immunity and thus must "demonstrat[e] a

constitutional violation and a clearly established right at the time of the incident." *Id.* (citing *Hart v. Hillsdale County*, 973 F.3d 627, 635 (6th Cir. 2020)). When the plaintiff names multiple defendants, liability "is analyzed individually based on" each official's "own actions." *Id.* (citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

**1. Officer Rea's Alleged Unreasonable Seizure in Violation of the Fourth Amendment**

The Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, guarantees people the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV; *see also United States v. Obasa*, 15 F.3d 603, 606 (6th Cir. 1994). Not all interactions between police officers and citizens involve seizures of persons under the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 552 (1980) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Rather, "a person is 'seized' only when, by means of physical force or a show of authority," his liberty is restrained in some way. *Id.* at 553; *see also Hopkins v. Nichols*, 37 F.4th 1110, 1115 (6th Cir. 2022) (quoting *Torres v. Madrid*, 592 U.S. 306, 311 (2021)). "A person's liberty is restrained if a reasonable person in the circumstances would not believe that [] he w[as] free to leave." *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005) (citing *Mendenhall*, 446 U.S. at 554). Generally, a law enforcement officer's seizure of a person is constitutionally permissible upon probable cause or reasonable suspicion that the person has committed, or is about to commit, a crime. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also Smith v. Stone*, No. 99-3208, 2000 U.S. App. LEXIS 11785, at *24 (6th Cir. May 19, 2000).

Here, the undisputed facts and evidence show that Officer Rea seized Isaifan. Certainly, grabbing Isaifan, (*see* R. 54; R. 46, PageID# 570–72), qualifies as a seizure. *See Mendenhall*, 446 U.S. at 553 (using physical force to restrain a person's "freedom of movement" qualifies as a

seizure). Regarding this initial seizure, Defendants argue that they had probable cause to seize Isaifan because he abandoned his vehicle on the highway partly obstructing the fast lane, violating Ohio Revised Code § 4511.66. (*See* R. 42, PageID# 164–66; R. 58, PageID# 1066–68). Plaintiff contends that they lacked probable cause or reasonable suspicion because "abandoning a vehicle on the public way is not a crime until the vehicle remains abandoned for 48 hours." (R. 56, PageID# 928 (citing *Harris*, 2009 WL 1114228, at *2)). "Probable cause exists where the 'facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person … in believing … that the suspect committed, is committing, or is about to commit an offense.'" *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016) (alterations in original) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)); *see also Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020) ("[u]nder the Fourth Amendment, an officer can seize someone so long as he has probable cause," which exists if he has reason to believe "that the person has violated the law").

Ohio Revised Code § 4511.66 provides that leaving a vehicle "upon the paved or main traveled part of the highway" is a third-degree misdemeanor "if it is practicable to stop, park, or so leave such vehicle off the paved or main traveled part of said highway" unless the vehicle is disabled. Ohio Rev. Code § 4511.66. Despite Plaintiff's assertions, this statute does not contain any waiting period, let alone a forty-eight hour one, before abandoning a vehicle on the paved or main traveled part of a highway becomes a misdemeanor crime. *See id.* For her assertions, Plaintiff relies upon *Harris*, a state case that is inapposite because it addresses Ohio Revised Code § 4513.61. 2009 WL 1114228, at *2. That section provides that law enforcement officers may place an abandoned vehicle into storage once it has been abandoned for forty-eight hours or, if it is obstructing traffic, immediately. Ohio Rev. Code § 4513.61.

12

Here, Defendants knew based on radio transmissions that a male wearing purple camouflage and a black vest had abandoned a vehicle partly in the fast lane on the highway. (R. 45, PageID# 393–98; *see also* R. 46, PageID# 539–43). Abandoning the vehicle there violated Ohio Revised Code § 4511.66. Then, Defendants saw Isaifan, who matched that description, walking on the side of the street. (*See* R. 45, PageID# 409–10; R. 46, PageID# 548–49; *see also* R. 54). They knew from the radio transmissions that the abandoned vehicle was registered to Isaifan and that his wallet and license were in the car alongside "a firearm" and ammunition. (R. 45, PageID# 398–400; *see also* R. 46, PageID# 539–40, 543). They also knew Isaifan's home address based on the radio transmissions and Isaifan's driver's license, so they could tell that he was walking towards his house. (*See* R. 45, PageID# 405–09; R. 46, PageID# 542–45, 548). Given Isaifan's "close physical match to the description of the person said to have" abandoned the vehicle coupled with the additional information connecting him to the abandoned vehicle, Defendants had probable cause to believe that Isaifan violated Ohio Revised Code § 4511.66, which is a misdemeanor crime. *See Turner v. Viviano*, No. 04cv70509, 2005 WL 1678895, at *7 (E.D. Mich. July 15, 2005). This probable cause supported Defendants seizing Isaifan. *See State v. McGrath*, 2021-Ohio-2605, No. 2019-CA-21, 2021 WL 3234792, at *3 (Ohio Ct. App. July 30, 2021). Because Defendants had probable cause to believe that Isaifan committed a crime, Officer Rea did not violate Isaifan's Fourth Amendment right to be free from unreasonable seizure by grabbing Isaifan's arm. *See Howse*, 953 F.3d at 409. Thus, Officer Rea is entitled to qualified immunity on this claim. *See Wiley*, 36 F.4th at 669.

**2. Seizure via Shooting and Alleged Excessive Force in Violation of the Fourth Amendment**

Based on the circumstances of this police encounter, the Court finds it appropriate to consider the second seizure via shooting and alleged excessive force claims together. The Fourth Amendment's prohibition on unreasonable seizures includes seizures effectuated using excessive force. *Stewart v. City of Euclid*, 970 F.3d 667, 672 (6th Cir. 2020) (citing *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)). Whether the force used to effectuate a seizure was constitutionally permissible "depends on context." *Id.* The amount of force used "must be objectively reasonable under the totality of the circumstances," *id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)), as "judged from the perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396. When evaluating the objective reasonableness of the force used, courts examine "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect [wa]s actively resisting arrest or attempting to" flee. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004)); *see also Stewart*, 970 F.3d at 672.

"In deadly force cases, the most critical factor is the immediate danger to officers and members of the public in the area," *Stewart*, 970 F.3d at 672 (citing *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)), because that factor "is dispositive," *Raimey v. City of Niles*, 77 F.4th 441, 449 (6th Cir. 2023) (citing *Foster v. Patrick*, 806 F.3d 883, 887 (6th Cir. 2015)). If a person "poses no immediate threat to the safety of an officer or others, the use of deadly force is unreasonable and violates the Fourth Amendment." *Id.* Furthermore, "[a]s a general rule, the Fourth Amendment prohibits the use of deadly force to prevent the escape of fleeing suspects unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Latits*, 878 F.3d at 547–48 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Here, the undisputed facts and evidence show that both Defendants seized Isaifan by shooting him, using deadly force against him, (*see* R. 42-5, PageID# 292; R. 45, PageID# 446; R. 46, PageID# 583). *See Stewart*, 970 F.3d at 672; *Yatsko v. Grazioli*, Nos. 20-3574, 3576, 3643, 2021 WL 5772527, at *6 (6th Cir. 2021) ("[T]here is 'no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.'" (quoting *Garner*, 471 U.S. at 7)). As explained above, Defendants had probable cause to seize Isaifan. Nevertheless, whether their use of deadly force to seize Isaifan violated his Fourth Amendment right to be free from unreasonable seizures effectuated by excessive force is a separate issue that the Court must consider.

As to the first consideration for determining the reasonableness of force used, the severity of the crime at issue here was low. Isaifan abandoned his vehicle on the highway such that it partly obstructed the fast lane, (R. 42-1, PageID# 189–90; *see also* R. 56, PageID# 925), violating Ohio Revised Code § 4511.66. This crime is "a minor misdemeanor," Ohio Rev. Code § 4511.66(B), and thus not particularly severe. As for the third consideration, the undisputed facts and evidence demonstrate that Isaifan attempted to both resist and flee. He physically resisted by "struggling with [Officer Rea], pushing [his] hand away," and breaking away when Officer Rea grabbed him. (R. 46, PageID# 570–72; *see also* R. 54; R. 56, PageID# 926). He then walked between Defendants and initially began walking past them, apparently attempting to resist or flee, before he stopped. (R. 54; *see also* R. 56, PageID# 927).

As to the second consideration, "merely possessing a weapon is not enough" for a person to pose an immediate threat. *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019). "But on the other end of the spectrum, an officer need not face the business end of a gun to use deadly force." *Id.* (citing *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017)). Defendants argue that

15

Isaifan posed an immediate threat because he resisted, ignored commands, drew a firearm, and started turning towards them with the firearm in his hand. (R. 42, PageID# 170–75, 177–79). They argue that under those circumstances, there is no genuine issue of material fact regarding whether using deadly force against Isaifan was objectively reasonable. *Id.* In support of their argument, they proffer their own deposition testimony, (R. 45; R. 46), and expert opinions that the physical evidence corroborates their version of events, (R. 42-6, PageID# 329; R. 42-7, PageID# 360). Plaintiff disputes Defendants' version of events, contending that Isaifan merely possessed a gun as he walked away from Defendants "with his back to" them. (R. 56, PageID# 930–31). She proffers Williams's testimony, the medical examiner's report, and the surveillance footage in support of her version of events. (*Id.* at PageID# 927, 930–31). She argues that this evidence creates a genuine issue of material fact as to the events preceding Defendants' use of deadly force and, therefore, whether Defendants' use of deadly force was reasonable. *See id.* Defendants argue that Plaintiff's proffered evidence does not create a genuine issue of material fact as to this sequence of events. (R. 58, PageID# 1072–75).

As to Williams's testimony, Plaintiff contends that it corroborates that Isaifan was walking away from Defendants and did not draw a firearm or start turning towards them when they started shooting him. (R. 56, PageID# 927, 930–31 (citing R. 47, PageID# 703, 706–08)). Nevertheless, as Defendants argue, Williams's testimony does not create a genuine issue of material fact because he did not witness the encounter leading up to or the beginning of the shooting itself. (R. 42, PageID# 175–77; R. 58, PageID# 1073–75). By his own admission, Williams heard at least one gunshot before he got up and "looked out through the blinds," meaning that he "didn't see the first shot," let alone the events preceding it. (R. 47, PageID# 688–90, 700). Thus, no dispute exists between Williams's testimony that he did not see what happened before Defendants initiated

16

deadly force and Defendants' testimony and proffered expert opinions that before the first shot, Isaifan started turning toward Officer Akers with a firearm in his right hand. *Cf. Roth v. Viviano*, No. 15-11972, 2016 U.S. Dist. LEXIS 67154, at \*8–9 (E.D. Mich. May 23, 2016).

Plaintiff highlights that Isaifan had multiple entry wounds in his back and side and that the entry wounds in the front of his body were angled downward even though he was taller than Defendants. (*See* R. 56, PageID# 927, 931 (citing R. 56-3, PageID# 1035–39)). She argues that this evidence supports her version of events and creates a genuine issue of material fact as to whether Isaifan started turning towards Officer Akers with a drawn firearm and, thus, whether Defendants' use of deadly force was reasonable. *Id.* Defendants proffer expert opinions that the physical evidence, including the evidence Plaintiff highlights, is consistent with their version of events. (R. 42-6, PageID# 329; R. 42-7, PageID# 360). Their first expert report is from Richard Ernest, a forensic ballistics consultant. (R. 42-6). Ernest opined that the "various shot paths into/through [Isaifan's] body …, coming from both front and back, indicate[d] that he was turning and bending over or falling during various points in this event," consistent with Defendants' testimony. (*Id.* at PageID# 329). Defendants' second expert report is from Scott Roder, an "Evidence Specialist" who "do[es] Crime Shooting Scene Reconstruction & Forensic Animation." (R. 42-7). Roder opined that the "physical and forensic evidence [were] consistent with [Defendants'] testimony" that Isaifan was turning during the shooting "to a reasonable degree of scientific probability." (*See id.* at PageID# 346–47, 360). The Court need not weigh this evidence or Defendants' credibility. Plaintiff, however, "offers no contrary expert testimony" to support her interpretation of the evidence and argument on this issue, (*see generally* R. 56). *Abboud v. Travelers Prop. Cas. Ins. Co.*, No. 1:20cv1523, 2022 WL 541189, at \*6 (N.D. Ohio Feb. 23, 2022). Instead, Plaintiff relies on her own perception of the physical evidence, making assertions

17

extrapolated from her own nonexpert review of the autopsy report, (*see generally* R. 56). *Abboud*, 2022 WL 541189, at *6. In doing so, Plaintiff fails to establish a genuine dispute of material fact as to whether the physical evidence demonstrates that Isaifan grabbed his gun from its holster and started turning towards Officer Akers with it in his hand. *See id.*

Finally, Plaintiff argues that the surveillance footage creates a genuine dispute of material fact regarding whether Isaifan grabbed his gun from its holster and started turning toward Officer Akers. (R. 56, PageID# 927, 931 (citing R. 54)). She asserts that the footage shows that Isaifan "never twist[ed] or lift[ed] his right arm prior to being shot" and Defendants "shot and killed [Isaifan] while he was walking away from them … without holding anything in his hand" while "making no movement toward them." (R. 56, PageID# 927, 931 (citing R. 54)). Despite Plaintiff's assertions, Defendants correctly note the surveillance video footage "is of poor quality" and taken at a far distance from the incident with trees and shrubs obstructing the view such that "it is not discernible from the video whether Isaifan was turning towards" Officer Akers "with a drawn firearm at the time of the shooting," (R. 58, PageID# 1072). (R. 54).

Although evidence is construed in the nonmovant's favor on summary judgment, "where, as here, some of the relevant facts are recorded on video, [the Court] view[s] those facts as the video depicts." *Francis v. Huff*, No. 22-5282, 2022 WL 7973109, at *2 (6th Cir. Oct. 14, 2022) (citing *Cunningham v. Shelby County*, 994 F.3d 761, 765 (6th Cir. 2021)). However, "[i]f the facts shown in the video can be interpreted in multiple ways, or if," as here, "the video does not show all relevant facts," the Court construes "any relevant uncertainties or gaps in the light most favorable to" the nonmovant. *Id.* (citing *Latits*, 878 F.3d at 544). Because the surveillance "video does not provide a clear picture of what happened" immediately before Defendants started shooting Isaifan, (R. 54), the Court construes "any relevant uncertainties in the light most favorable

18

to" Plaintiff. *Francis*, 2022 WL 7973109, at *3 (citing *Latits*, 878 F.3d at 544). "But even so construed, an inference, unsupported by additional evidence, does not provide a sufficient basis for a jury to reasonably find in [Plaintiff]'s favor." *Id.* (citing *Anderson*, 477 U.S. at 250). Thus, because, as explained above, no additional evidence supports an inference that Isaifan did not start to turn towards Officer Akers with a drawn firearm, the surveillance footage does not create a genuine issue of material fact. *Id.*

Because Plaintiff's proffered evidence does not create a genuine dispute as to whether Isaifan grabbed his gun from its holster and started turning towards Officer Akers with it in hand, the only issue that remains is whether Isaifan posed an immediate threat when he did so such that Defendants' use of deadly force was objectively reasonable. A person does not pose an immediate threat because he merely possesses a weapon. *Jacobs*, 915 F.3d at 1040. Similarly, an officer may not "shoot a suspect merely because he has a gun in his hand." *Thomas*, 854 F.3d at 366. But depending upon the totality of the circumstances, a person need not necessarily point a gun at an officer, *Jacobs*, 915 F.3d at 1040, or even raise a gun to pose an immediate threat such that officers using deadly force is objectively reasonable, *Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018); *see also Thomas*, 854 F.3d at 366. Whether a person "has a weapon constitutes just one consideration in assessing the totality of the circumstances." *Thomas*, 854 F.3d at 366 (citing *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016)).

The Sixth Circuit held that using deadly force was objectively reasonable when a person facing officers from a "short distance" away held a gun as though he could point it at them and "fire at any moment," even though he did not raise the gun or point it at them. *Thornton*, 727 F. App'x at 831, 837–38. It also held that using deadly force was objectively reasonable when a person with a gun in his hand ran toward and came close to an officer, even though he did not raise

the gun or point it at the officer. *Thomas*, 854 F.3d at 363, 365–67. Finally, it held that using deadly force was objectively reasonable when an officer knocked on a car's driver's window and saw the initially compliant person in the driver's seat stop complying and "pick up and swing [a] gun in his direction." *Jordan v. Howard*, 987 F.3d 537, 539–40, 543–44 (6th Cir. 2021).

Here, on exiting their vehicle, Defendants yelled that they were Akron police officers and ordered Isaifan to raise his hands. (R. 45, PageID# 421; R. 46, PageID# 565–66). Although Isaifan initially complied and raised his hands, he then lowered them and began to walk toward Defendants. (R. 54; *see also* R. 45, PageID# 421, 428–30; R. 46, PageID# 566). As Isaifan walked towards Defendants, they told him to get on the ground, but he did not comply and instead continued walking towards them. (R. 45, PageID# 429–30, 435; R. 46, PageID# 570). Officer Rea grabbed Isaifan as he attempted to walk between Defendants, but Isaifan resisted, "struggling with [Officer Rea], pushing [his] hand away," and ultimately pulling away. (R. 46, PageID# 570, 580; *see also* R. 45, PageID# 430). Officer Rea and Isaifan tripped in the scuffle, and Officer Akers saw that Isaifan had a gun on his right hip and shouted that information multiple times to notify Officer Rea. (R. 45, PageID# 430, 442). Defendants again ordered Isaifan to get on the ground, but he was "not following any commands whatsoever." (R. 46, PageID# 580; *see also* R. 45, PageID# 441).

Instead, Isaifan took a few steps, suddenly stopped, and grabbed the gun from its holster. (R. 45, PageID# 439–40; R. 46, PageID# 580–81). When he removed the gun from its holster, he simultaneously began turning and shifting his hips toward Officer Akers. (R. 45, PageID# 446–49; R. 46, PageID# 582–83). Thus, like the plaintiff in *Thornton* and the decedents in *Thomas* and *Jordan*, Isaifan was relatively close to Defendants when he drew his gun and began turning because he had taken only a few steps past them before stopping. (*See* R. 45, PageID# 439–40; R. 46, PageID# 580–81). Like the suspect in *Jordan*, he suddenly stopped what he was doing, drew a

20

firearm, and started turning towards an officer. (R. 45, PageID# 439–49; R. 46, PageID# 580–83). Only then did Defendants begin shooting at Isaifan. (*See* R. 45, PageID# 446–49; R. 46, PageID# 582–83). Officer Rea "fired [his] first round in [Isaifan]'s back area, center mass, but [Isaifan] continued" turning towards Officer Akers. (R. 46, PageID# 583). As such, Officer Rea thought Isaifan's "vest was stopping the rounds," so Officer Rea "fired below the vest to try to get him to stop shifting towards Officer Akers." *Id.* Nevertheless, Isaifan "continued spinning all the way around." *Id.* Consequently, although Defendants' first shots were in Isaifan's back, their last shots were "towards the chest area." (*See id.* at PageID# 592). They continued shooting until Isaifan fell to the ground on his back and no longer held a gun. (R. 45, PageID# 452–54; R. 46, PageID# 592–93). From the time Isaifan walked past Officer Rea to the point at which Isaifan fell to the ground, only five seconds passed. (R. 54).

Thus, within the span of five seconds, Isaifan resisted Officer Rea and refused to follow commands; suddenly stopped walking, unholstered and grabbed his gun, and started turning towards Officer Akers with the gun in hand while he was close to Defendants; and continued to turn as Defendants shot. Therefore, "from the perspective of a reasonable officer on the scene" making "split-second judgments" in "tense, uncertain, and rapidly evolving" circumstances, *Graham*, 490 U.S. at 396, Isaifan posed an immediate threat to Defendants, *see Jordan*, 987 F.3d at 539–40, 543–44; *see also Thornton*, 727 F. App'x at 831, 837–38; *Thomas*, 854 F.3d at 363, 365–67. Defendants' use of deadly force was objectively reasonable given the totality of the circumstances. *See Jordan*, 987 F.3d at 539–40, 543–44; *see also Thornton*, 727 F. App'x at 831, 837–38; *Thomas*, 854 F.3d at 363, 365–67. Plaintiff does not demonstrate a genuine issue of material fact regarding whether Defendants' use of force was excessive in violation of the Fourth Amendment. Accordingly, Defendants are entitled to qualified immunity on these claims. *See*

*Wiley*, 36 F.4th at 669. As such, Defendants are entitled to judgment as a matter of law, and the Court will grant their motion for summary judgment.

### V. Conclusion

For the foregoing reasons, Plaintiff's state-law claims at Counts III and IV of the Amended Complaint, (R. 11), are dismissed at her request, (R. 56), and Defendants' motion for summary judgment, (R. 42), is GRANTED as to Plaintiff's remaining claims. The remaining pending motion, (R. 62), is denied as moot.

IT IS SO ORDERED.

s/ *David A. Ruiz*

David A. Ruiz
United States District Judge

Date: June 23, 2025